PD-1391-15

PD-1391-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/26/2015 3:40:33 PM
Accepted 10/27/2015 4:38:19 PM
ABEL ACOSTA
CLERK

PDR NO. _____

COURT OF APPEALS

CAUSE NO. 11-13-00277-CR

TO THE COURT OF CRIMINAL APPEALS OF TEXAS

THE STATE OF TEXAS

Appellant

V.

MIKENZIE RENEE RODRIGUEZ

Appellee

PETITION FOR DISCRETIONARY REVIEW

FILED IN
COURT OF CRIMINAL APPEALS

October 27, 2015

ABEL ACOSTA, CLERK

Micheal B. Murray
35th District Attorney
State Bar No.  00792955
200 S. Broadway, Ste. 323
Brownwood, Texas 76801
TEL: (325) 646-0444
FAX: (325) 643-4053

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................2

INDEX OF AUTHORITIES.....................................................................3

LIST OF PARTIES...................................................................................5

STATEMENT REGARDING ORAL ARGUMENT ...............................6

STATEMENT OF THE CASE.................................................................6

STATEMENT OF PROCEDURAL HISTORY.......................................6

GROUNDS FOR REVIEW ....................................................................7

    1. Should a court of appeals consider all of the totality of the circumstances, including: (a) who initially searched a dorm room, (b) whether law enforcement had to conduct any additional search beyond a search conducted by university officials, and (c) whether a student consented to university officials searching her room, when determining whether the Fourth Amendment was implicated by law enforcement's actions in entering a dorm room?

    2. Should a university's duty to provide a safe environment, with an atmosphere conducive to the educational process, and the minimal intrusion by law enforcement be balanced against a college student's Fourth Amendment rights when determining the reasonableness of a dorm room search?

    3. The Court of Appeals erred in categorically ruling that the plain view doctrine did not apply because university administrators cannot have actual or apparent authority to consent to law enforcements' entry into a dormitory room.

ARGUMENT ...........................................................................................8

CONCLUSION ......................................................................................21

CERTIFICATE OF SERVICE ..............................................................21

CERTIFICATE OF COMPLIANCE......................................................22

APPENDIX ............................................................................................23

# INDEX OF AUTHORITIES

## STATUTES

Rule of Appellate Procedure 66.3 ...............................................................15,19


## CASES

*Cal. v. Acevedo,* 500 U.S. 565 (1991) .................................................9,10

*Com. v. McCloskey*, 272 A.2d 271 (Pa. 1970) ......................................19

*Devers v. Southern University*, 97-0259 (La. App. 1 Cir. 4/8/98) ....................15,16

*Grubbs v. State,* 177 S.W.3d 313
(Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) ..........................................passim

*Illinois v. McArthur*, 531 U.S. 326 (2001) ..............................................10

*Ker v. Cal.*, 374 U.S. 23 (1963) ........................................................9

*Kyllo v. U.S.*, 533 U.S. 27 (2001) ........................................................10

*Medlock v. Trustees of Indiana Univ.,* 738 F.3d 867 (7th Cir. 2013) ..............passim

*Medlock v. Trustees of Indiana Univ.*, No.1:11-CV-00977-TWP-DKL,
2013 WL 1309760 (S.D. Ind. Mar. 28, 2013) ......................................15

*Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F.Supp. 725
(M.D. Ala. 1968) .......................................................................15,17

*New Jersey v. T.L.O.,* 469 U.S. 325 (1985) .......................................8,9

*Piazzola v. Watkins*, 442 F.2d 284 (5th Cir. 1971) .........................................passim

*Riley v. Cal.,* 134 S.Ct. 2473 (2014) ....................................................9

*Smyth v. Lubbers*, 398 F.Supp. 777 (W.D. Mich. 1975) ......................................15

*State v. Hunter*, 831 P.2d 1033 (Utah Ct. App. 1992) .................................13,15,16

*State v. Kappes,* 550 P.2d 121 (Ariz. Ct. App. 1976) ..................................13,16,19

*State v. Rodriguez,* No. 11-13-00277-CR, 2015 WL 5714548
(Tex. App.—Eastland Sept. 24, 2015, pet. filed). ...........................................passim

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503 (1969) ......................17

*U.S. v. Drayton,* 536 U.S. 194 (2002) .....................................................................9

*U.S. v. Jacobsen,* 466 U.S. 109 (1984) .................................................................12

*U.S. v. York,* 895 F.2d 1026 (5th Cir. 1990) .........................................................10

# LIST OF JUDGE, PARTIES AND COUNSEL

1. The Trial Court

   The Honorable Stephen Ellis
   35th Judicial District Judge
   200 S. Broadway
   Brownwood, Texas 76801

2. The State of Texas

   *Appellate Counsel*
   Micheal B. Murray
   35th Judicial District Attorney
   200 S. Broadway, Suite 323
   Brownwood, Texas 76801

   *Trial & Appellate Counsel*
   Elisha Bird
   Assistant District Attorney
   200 S. Broadway, Suite 323
   Brownwood, Texas 76801

3. Mikenzie Renee Rodriguez

   *Trial & Appellate Counsel*
   Sharon Diaz
   Attorney at Law
   315 North 2nd Street
   Rosebud, Texas 76570

   Matthew Wright
   Attorney at Law
   315 North 2nd Street
   Rosebud, Texas 76570

TO THE HONORABLE COURT OF CRIMINAL APPEALS OF TEXAS:

## *STATEMENT REGARDING ORAL ARGUMENT*

The State requests oral argument because this case presents several important issues that would have application far beyond the facts of this case.

## *STATEMENT OF THE CASE*

Resident Assistants (RA's) searched Appellee's dorm room pursuant to a housing agreement between Appellee and a private university while Appellee was not present.  R.R. Vol. 2, pp. 22-23, 76-79; R.R. Vol. 3, State's Exhibit 2 (Attached as Appendix A).  The RA's located ecstasy and drug paraphernalia during the search and placed the items on the floor of the dorm room.  R.R. Vol. 2, pp. 22-29.

The University's Resident Director contacted university police and escorted a university police officer into the dorm room.  R.R. Vol. 2, pp. 30-32.  The officer, upon entering the room, immediately recognized the items on the floor as illegal contraband.  R.R. Vol. 2, pp. 33-34, 43-45.

## *STATEMENT OF PROCEDURAL HISTORY*

Appellee was indicted for Possession of a Controlled Substance and filed a motion to suppress.  C.R. p. 11, 47-50.   After a hearing, the trial judge granted Appellee's motion.  R.R. Vol. 2, p. 1; C.R. p. 78.

The Eleventh Court of Appeals affirmed the trial court's ruling in this case on September 24, 2015.  *See generally State v. Rodriguez,* No. 11-13-00277-CR, 2015 WL 5714548 (Tex. App.—Eastland Sept. 24, 2015, pet. filed) (attached as

Appendix B) (hereinafter *Rodriguez,* 2015 WL 5714548). A motion for rehearing was not filed. The State Petition for Discretionary Review is due on October 26, 2015.

## *GROUNDS FOR REVIEW*

1. Should a court of appeals consider all of the totality of the circumstances, including: (a) who initially searched a dorm room, (b) whether law enforcement had to conduct any additional search beyond a search conducted by university officials, and (c) whether a student consented to university officials searching her room, when determining whether the Fourth Amendment was implicated by law enforcement's actions in entering a dorm room?

2. Should a university's duty to provide a safe environment, with an atmosphere conducive to the educational process, and the minimal intrusion by law enforcement be balanced against a college student's Fourth Amendment rights when determining the reasonableness of a dorm room search?

3. The Court of Appeals erred in categorically ruling that the plain view doctrine did not apply because university administrators cannot have actual or apparent authority to consent to law enforcements' entry into a dormitory room.

## *ARGUMENT*

This petition for discretionary review should be granted because the Eleventh Court of Appeals issued a decision that will have far-reaching implications for searches of college dormitory rooms. Because this Court has not yet issued an opinion related to searches of dorm rooms, this case will be treated as one of the few authoritative cases on this issue. *See* Texas District & County Attorneys Association*, Case of the Week* (Oct. 9, 2015, 3:06 PM), http://www.tdcaa.com/ (attached as Appendix C).

The Supreme Court of the United States noted in relation to secondary schools that:

> Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crimes in the schools have become major social problems. *New Jersey v. T.L.O.,* 469 U.S. 325, 339 (1985).

This statement, while certainly true in 1985, has become even more evident in light the recent shooting at Texas Southern University, the Virginia Tech shooting, the Columbine shooting, and numerous other shootings.

Drug use is also increasing among students. The National Institute on Drug Abuse states that the "[u]se of illicit drugs, including marijuana, has been rising steadily among college-aged young adults." Nat'l Inst. on Drug Abuse, *NIDA highlights drug use trends*, (May 18, 2015), http://www.drugabuse.gov/ news-

events/news-releases/2015/05/nida-highlights-drug-use-trends-among-college-age-young-adults-in-new-online-resource (attached as Appendix D).

To leave officers without guidance on how to approach college environments will create inconsistency. Considering the increased need to maintain order in colleges, this Court should address how the Fourth Amendment relates to this environment.

### Conflict with applicable decisions of Court of Criminal Appeals and Supreme Court

This Court should grant review because the court of appeals' decision conflicts with the applicable decisions of the Court of Criminal Appeals and the Supreme Court of the United States requiring an examination of the totality of the circumstances when considering Fourth Amendment reasonableness.

The touchstone of the Fourth Amendment is reasonableness. *Riley v. Cal.,* 134 S.Ct. 2473, 2482 (2014). There is no formula for reasonableness, but rather each case should be decided on its own facts and circumstances. *Ker v. Cal.*, 374 U.S. 23, 33 (1963) (plurality opinion).

*Per-se* rules are, for the most part, inappropriate in a Fourth Amendment context. *U.S. v. Drayton,* 536 U.S. 194, 201 (2002). Context is critical for a proper assessment of what is reasonable. *See T.L.O.,* 469 U.S. at 337 (1985).

Generally a warrant is the preferred method of showing reasonableness. *See Cal. v. Acevedo,* 500 U.S. 565, 582 (1991) (Scalia, J., concurring). However,

"[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001).

Significantly, "school searches" have been held to be one of those exceptions. *Acevedo,* 500 U.S. 565 at (1991) (Scalia, J., concurring).

Even when a residence is involved, the Fourth Amendment is not implicated unless the government violates a defendant's subjective expectation of privacy that society is willing to recognize as reasonable. *Kyllo v. U.S.*, 533 U.S. 27, 33 (2001).

Activities or circumstances within a dwelling may lessen an owner's reasonable expectation of privacy by creating a risk of intrusion which is "reasonably foreseeable." *U.S. v. York,* 895 F.2d 1026, 1029 (5th Cir. 1990).

The court of appeals' decision relied on the general principles of privacy. *See Rodriguez,* 2015 WL 5714548 at *2-6. The decision did not analyze how the totality of the circumstances may have lessened Appellee's expectation of privacy.[1]
*Id.*

---

[1] In its analysis, the Eleventh Court of appeals *starts* by holding that law enforcements' entry into the dorm room constituted a search and then *after that* addressed Appellee's expectation of privacy. *See State v. Rodriguez,* 2015 WL 5714548 at *4 ("Thus, the officers' entry into Appellee's dorm room constituted a search. We must next answer the question of whether Appellee had a subjective expectation of privacy in her dorm room that society considers objectively reasonable.").

Some of the key facts that were particular to the case at bar but were summarily dismissed by the Eleventh Court of Appeals[2] are that:

(1) The initial search of the defendant's dorm room was done by university officials (C.R. p. 93, para. 4 and p. 96, para. 2-3)[3];

(2) All of the contraband was located by university personnel and laid out onto the floor. Law enforcement did not have to touch or manipulate the items in any way to note the illegal nature of the items, and law enforcement was not present when the items were laid out on the floor (C.R. p. 94, para. 11, 16, 18 and p. 95, para.19, R.R. Vol. 2, pp. 24-26, 29.);

(3) The defendant signed a University Housing Agreement at the beginning of the school year which allowed the university to search her dorm room "to inspect property, seek and/or confiscate unauthorized property…or for any other purpose including suspected violations of University

---

Such reasoning necessarily fails to consider the totality of the circumstances. Determining whether any Fourth Amendment protection exists must happen *before* concluding that a search occurred.

[2] The Court of Appeals was dismissive of this argument based on its perception that the State did not argue this theory at the hearing. *See Rodriguez,* 2015 WL 5714548 at *2.

However, in addition to the oral arguments, the State filed a brief in which it argued both that the Fourth Amendment was not implicated by a "search," and that even if there was a search, that search was reasonable under the Fourth Amendment in light of the fact that university officials had discovered the contraband before law enforcement was involved. C.R. p. 59-60.

In its brief filed with the trial court, the State argued:

Assuming that the Fourth Amendment is implicated at all, the issue in this case is exactly the same as in *Medlock*. Can an officer come to a dorm room, when school officials have already discovered drugs as a result of a routine health and safety inspection, and seize drugs found in plain view? The answer from *Medlock*, the only on point case, is unequivocally yes. C.R. p. 60.

The clear intent of the State was to raise the issue of whether the Fourth Amendment was implicated by law enforcement officers coming into a dorm room after a private party had already searched.

[3] The trial court held that the university officials were not involved in law enforcement or acting at the request of law enforcement. *See* C.R. p. 93, para. 4, p. 96, para. 2-3.

11

policies…"(R.R. Vol. 2, pp. 16-17, C.R. p. 96, para. 1; R.R. Vol. 3, State's Exhibit 2, Attached as Appendix A);

*A Private Party Search & Its Impact on a Reasonable Expectation of Privacy*

The court of appeals' decision does not address how the first two facts listed above diminished the Defendant's expectation of privacy, other than to dismiss these facts as irrelevant because the Defendant did not know that contraband was found. *See Id.* at *5.

The private party search doctrine does not require that a defendant know that a search did in fact occur or know that the defendant's expectation of privacy had in fact been frustrated. *See U.S. v. Jacobsen,* 466 U.S. 109, 111-13 (1984).

The Eleventh Court of Appeals' decision reads a new element of knowledge after the fact into the private party search doctrine. Such an interpretation is novel and forces courts to ignore the totality of the circumstances.

This Court should grant discretionary review to address whether the private party search doctrine requires that a defendant know that their expectation of privacy has been frustrated.

*A Housing Agreement & Its Impact on a Reasonable Expectation of Privacy*

Also, the court of appeals' decision failed to address what effect the housing agreement had on either a subjective or objective expectation of privacy. *See Rodriguez,* 2015 WL 5714548 at *2-6.

12

Residents of dormitories at Howard Payne University were required to complete a University Housing Application/Agreement in order to live in a dorm room. R.R. Vol. 2, pp. 76-77. The University Housing Application/Agreement stated that:

> The University may enter a student's room to inspect property, seek and/or confiscate unauthorized property, make repairs, respond to an emergency, ensure evacuation during a fire/tornado alarm, or for any other purposes including suspected violations of University policies at any time. R.R. Vol. 3, State's Exhibit 2.

> University policy as stated in the Student Handbook included an expectation

that students be "law abiding" and prohibited conduct such as:

> 11. Violation of any law…

> 15. The use or possession of drug paraphernalia (e.g., pipes, roach clips, etc.)…

> 16. The use or possession of illegal drugs... R.R. Vol. 3, State's Exhibit 3.

> Appellee completed a University Housing Application/Agreement prior to

moving into the dorms at the University. See R.R. Vol. 2, pp. 17, 77-78.

Numerous cases have considered housing agreements among the totality of circumstances in Fourth Amendment dormitory search analysis. *See Medlock v. Trustees of Indiana Univ.,* 738 F.3d 867, 872 (7th Cir. 2013); *Grubbs v. State,* 177 S.W.3d 313, 319 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *State v. Hunter*, 831 P.2d 1033, 1035 (Utah Ct. App. 1992), *cert. denied* 843 P.2d 1042 (Utah 1992); *State v. Kappes,* 550 P.2d 121, 124-25 (Ariz. Ct. App. 1976).

13

By failing to consider or even mention the impact the housing agreement had on a dorm resident's expectation of privacy, the court failed to consider the totality of the circumstances. The error in this case is egregious as such agreements are common and create a unique aspect to dormitory living that is not present in any other type of residence.

*Totality of the Circumstances*

The error of the Eleventh Court of Appeals in not considering these three facts is compounded by its error in failing to consider other facts in this case.

The court of appeals did not address the facts that:

(1) A university administrator, as opposed to a student resident assistant, escorted the law enforcement officer into the dorm room. R.R. Vol. 2, pp. 22, 24, 32, 44, 67-68;

(2) Appellee was notified at a mandatory hall meeting that the Resident Assistants would be searching the dorm rooms prior to the search. R.R. Vol. 2, pp. 18-19;

(3) The University's Student Handbook prohibited the use or possession of drug paraphernalia and illegal drugs. R.R. Vol. 3, State's Exhibit 3;

(4) Law enforcement was not present when the items were placed on the floor exposed to view. R.R. Vol. 2, p. 24-26, 29;

14

(5) Considering the time-frame of law enforcements' actions in the dorm room, any photographs taken or interviews done would have occurred after law enforcement saw the ecstasy and drug paraphernalia. R.R. Vol. 2, pp. 44, 37-38, 51-53; C.R. p. 95, para. 20-22.

All of these facts should have been addressed and accounted for when considering whether the Fourth Amendment was implicated by law enforcement's involvement.

### Unsettled question of state and federal law

Additionally, this Court should grant review because the application of the Fourth Amendment to searches of dormitories is an important question of both state and federal law that has not been, but should be, settled by this Court.

### Competing Approaches to Evaluating Dormitory Searches

Although courts in several jurisdictions have addressed how the Fourth Amendment applies to college dormitories, neither this Court nor the Supreme Court of the United States has yet issued any guidance.[4]

---

[4] *See generally Piazzola v. Watkins*, 442 F.2d 284 (5th Cir. 1971); *Medlock v. Trustees of Indiana Univ.*, 738 F.3d 867 (7th Cir. 2013); *Smyth v. Lubbers*, 398 F.Supp. 777 (W.D. Mich. 1975); *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F.Supp. 725 (M.D. Ala. 1968); *Medlock v. Trustees of Indiana Univ.*, No.1:11-CV-00977-TWP-DKL, 2013 WL 1309760 (S.D. Ind. Mar. 28, 2013) aff'd, 738 F.3d 867 (7th Cir. 2013); *State v. Hunter*, 831 P.2d 1033 (Utah Ct. App. 1992) *cert. denied* 843 P.2d 1042 (Utah 1992); *Devers v. Southern University*, 97-0259 (La. App. 1 Cir. 4/8/98), 712 So.2d 199.

*Grubbs v. State* is the only other Texas case on this topic. The First Court of Appeals explicitly recognized in *Grubbs* that this is a question of first impression in Texas. 177 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Other jurisdictions are quite divided in their approach to handling searches of dormitories.[5] Some jurisdictions have approached searches of dorm rooms from the perspective that the "right of privacy protected by the fourth amendment does not include freedom from reasonable inspection of a school-operated dormitory room by school officials." *State v. Hunter*, 831 P.2d 1033, 1035 (Utah Ct. App. 1992), *cert. denied* 843 P.2d 1042 (Utah 1992) (quoting *State v. Kappes,* 550 P.2d 121, 124 (Ariz. Ct. App. 1976)).

While others have adopted a far more hostile position towards university searches. For example, the First Circuit Court of Appeals in Louisiana held a housing regulation unconstitutional because the regulation conditioned attendance at a state school on a student's renunciation of his constitutional rights. *Devers v. Southern University*, 97-0259 (La. App. 1 Cir. 4/8/98), 712 So.2d 199, 204-07.

---

[5] *See, e.g., Medlock v. Trustees of Indiana Univ.,* 738 F.3d 867, 873 (7th Cir. 2013) (calling a §1983 lawsuit against a university and law enforcement "near frivolous"); *Piazzola v. Watkins*, 442 F.2d 284, 286- (5th Cir. 1971) (holding that a search without a warrant of a dorm room by law enforcement officers and university officials was unreasonable); *Devers v. Southern University*, 97-0259 (La. App. 1 Cir. 4/8/98), 712 So.2d 199, 204, 210 (holding that a broadly worded housing agreement was prima facie unconstitutional); *State v. Hunter*, 831 P.2d 1033, 1035 (Utah Ct. App. 1992) *cert. denied* 843 P.2d 1042 (Utah 1992) (explicitly recognizing the split in authority among different jurisdictions); *State v. Kappes,* 550 P.2d 121, 124-25 (Ariz. Ct. App. 1976) (holding that a search by student advisors was reasonable).

The language used in many dormitory search cases is likewise confusing and contradictory. Opposing values involved in a college setting are in direct tension with each other. Universities are expected to "promulgate and to enforce reasonable regulations designed to protect campus order and discipline and to promote an environment consistent with the educational process." *Moore v. Student Affairs Comm. of Troy State Univ.*, 284 F.Supp. 725, 729 (M.D. Ala. 1968). While at the same time, students do not shed their constitutional rights at the schoolhouse gate. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969).

The balance required between these two fundamental principles makes it imperative that this Court address the issue of how to weigh out these competing interests.

*A University's Authority*

This Court should also issue guidance on whether university officials have authority to summon law enforcement once an illegal substance has been found in a dormitory.

The court of appeals' decision framed its entire discussion around whether dorm personnel could consent to the officer's entry into the dorm room.[6] *See State v. Rodriguez,* 2015 WL 5714548 at \*5.

The court of appeals cited to a footnote in *Grubbs* for authority that a resident assistant may not consent to allow police into a dorm room. *Id.* at \*6. The court then cited extensively to *Piazzola v. Watkins* from the Fifth Circuit Court of Appeals for support for the same proposition.

However, the footnote in *Grubbs* simply listed the cases cited to by the Appellant in that case. *See Grubbs v. State,* 177 S.W.3d 313, 321 fn.2 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Those cases were not cited by the First Court of Appeals as correct statements of law.

Nor does *Piazzola* directly resolve this question. *Piazzola's* holding is limited by its own text to the conclusion that a university has "no authority to consent to or join in *a police search for evidence of a crime.*" 442 F.2d 284, 290

---

[6] The Court of Appeals' decision is dismissive of the State's apparent authority argument claiming that the State "specifically argued that apparent authority was not addressed at all." *See State v. Rodriguez*, 2015 WL 5714548 at \*6-7. However, the Court of Appeals misquoted the State's closing argument in its decision. The actual statement was:

> Additionally, even if you don't want to rely solely on Medlock, there is not only the doctrine of consent, there is also the doctrine of apparent authority. And Ms. Pryor, as an official at the university, would have had apparent authority to invite the officer in. That is something that has not been at all addressed. That would allow him the ability to step into the room. R.R. Vol. 2, p. 91.

While admittedly not the State's main argument at the hearing, the issue was certainly directly raised.

(5th Cir. 1971) (involving a search that was initiated by law enforcement, not university officials).

As with searches of dormitories in general, authority from other jurisdictions is split on this issue also.[7]

There is no case law from either this Court or the Supreme Court of the United States that directly addresses this issue, therefore, this Court should grant discretionary review.

### *Conflict with decision from First Court of Appeals on same issue*

Finally, this Court should grant this petition because the court of appeals' decision conflicts with *Grubbs v. State* from the First Court of Appeals.

As articulated above, different jurisdictions have approached searches of college dormitories from different perspectives. Cases such as *Piazzola* and *Devers,* which find very little, if any, distinction between a residence and a dorm room, lie at one end of the spectrum. While cases such as *Hunter, Medlock* and *Kappes* acknowledge the unique nature of life in a dormitory and lie at the other end of the continuum.

---

[7] *See Medlock v. Trustees of Indiana Univ.,* 738 F.3d 867, 873 (7th Cir. 2013) (holding that student inspectors acted sensibly in summoning a university police officer once marijuana was located); *State v. Kappes,* 550 P.2d 121, 124 (Ariz. Ct. App. 1976) (holding that student resident advisors were justified in admitting law enforcement into a dorm room once marijuana was discovered); *Com. v. McCloskey*, 272 A.2d 271, 273 (Pa. 1970) (holding that a university could not consent to allow police to search a dorm room).

While no obvious contradictions appear from the text of the decisions in *Grubbs* and the case at bar because of the factual differences between the two cases,[8] each case represents a different approach to handling the search of dormitories.

The reasoning in *Grubbs* clearly is aligned with and supportive of the cases which recognize that a university has unique obligations and duties that may affect a Fourth Amendment analysis.

*Grubbs* carefully distinguish itself factually from *Piazzola*. *Grubbs v. State,* 177 S.W.3d 313, 320-21 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). *Grubbs* also cites approvingly to *Hunter* as support for the conclusion that a student may waive Fourth Amendment rights by signing a housing contract. *Id.* at 319.

However, the court of appeals' decision in this case aligns itself with *Piazzola*. The court of appeals cites to *Piazzola* extensively and approvingly without any acknowledgement of the significant factual differences. *See State v. Rodriguez,* 2015 WL 5714548 at *4-6.

---

[8] In *Grubbs,* the defendant was present during, and personally consented to, the search. *Grubbs v. State,* 177 S.W.3d 313, 316 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). In the case at bar, the defendant was not present until after law enforcement had entered the room and seen the illegal items. *State v. Rodriguez,* 2015 WL 5714548 at *1.

This different approach by two different courts of appeals in Texas will result in confusion as courts attempt to apply two different and opposing perspectives.

## *PRAYER FOR RELIEF*

Therefore, the State respectfully requests that this Court grant discretionary review.

Respectfully Submitted,

/S/ MICHEAL B. MURRAY
MICHEAL B. MURRAY
35th District Attorney
State Bar No. 00792955
200 S. Broadway, Ste. 323
Brownwood, Texas 76801
(325)646-0444/Fax:(325)643-4053

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Petition was mailed by U.S. Mail to Sharon Diaz, Attorney at Law and Matthew Wright, Attorney at Law, 315 N. 2nd Street, Rosebud, Texas 76570, on the 26th day of October, 2015.

/S/ MICHEAL B. MURRAY
MICHEAL B. MURRAY

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Petition was mailed by U.S. Mail to the State Prosecuting Attorney, Lisa McMinn, P.O. Box 12405, Austin, Texas 78711, on the 26th day of October, 2015.

/S/ MICHEAL B. MURRAY
MICHEAL B. MURRAY

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 4,472 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/S/ MICHEAL B. MURRAY
MICHEAL B. MURRAY

**APPENDIX A**



# ReturnerRE
## University Housing Application/Agreement: 2012-2013 Academic Year


STATE'S EXHIBIT

This is an agreement between Howard Payne University and the named student, and with the parent or guardian of the student if the student is under eighteen years of age, for a residence hall assignment only. It does not constitute a commitment of admission to the University. This agreement may be terminated only under the conditions specified herein. Students and parents/guardians are urged to carefully read this agreement. When this form is completed and returned to the Office of Student Life, it becomes a binding agreement between the student (the parent or guardian if the student is under 18 years of age) and the University for the 2012-2013 academic year.

Howard Payne University requires full-time, unmarried students between the ages of 17 and 22 who are not living with parents to live in a University residence hall for four (4) full semesters (i.e., fall and spring semesters) until 60 verifiable credit hours are completed or the student reaches 22 years of age. Students under the age of 17 are restricted from living in University housing. Students who will be living in University housing must submit a $200 Enrollment Deposit -- $100 of which serves as a Housing Deposit -- along with the completed *University Housing Application/Agreement*. No room assignments can be made until the *University Housing Application/Agreement* and Housing Deposit have been received by the Office of Admission. All students living in University residence halls will be charged for room and board at the time of registration. University housing is reserved for students who are registered as full-time students (12 or more semester credit hours).

This agreement is binding for the full 2012-2013 academic year, does not guarantee assignment to a particular room or residence hall, and is binding regardless of the room assignment.

| Name (Last, First, MI) | Name I Prefer To Be Called (if different) | Transfer Student? Yes  No | Gender (circle one) Female  Male |
|---|---|---|---|
| Student ID # | Birth Date (mm/dd/yy) | Frequently Used E-mail Address | |
| Cell Phone Number ( ) | Permanent Phone Number ( ) | Individual to Contact in Case of Emergency and Relationship: | |
| Permanent Address (Street and Number or P O Box) | | Emergency Contact's Phone Number ( ) | |
| City, State & Zip | | Emergency Contact's Work Phone Number ( ) | |

| Classification for 2012-2013 FR  SO  JR  SR | Residence Hall Preference for Men: Jennings Hall Taylor Hall | Roommate Request (Must be mutual) | Meal Plan (Required) - Please select a meal plan: #1 (Unlimited plan/$100 Jacket Bucks /$125 Stinger Bucks) #2 (15 meals per week/$150 Jacket Bucks /$125 Stinger Bucks) |
|---|---|---|---|
| Do you require any special housing accommodations because of a disability?  No  Yes If yes, please attach an explanation to this application. | | Have you ever been convicted of a crime, or are there charges currently pending against you? No  Yes  Explain: | #3 (12 meals per week/$200 Jacket Bucks/$125 Stinger Bucks) NOTE: If a meal plan is not selected, the student will automatically default to meal plan #1. |

Vaccination: I acknowledge that I am required to be vaccinated against bacterial meningitis at least 10 days prior to moving in to campus housing (see details on reverse).
Yes

My signature below indicates that I have read and accept the terms of this agreement in full, and agree to abide by all terms, policies, and regulations herein. If the student is not at least 18 years of age on the signing date, a parent or guardian must also sign where indicated, guaranteeing compliance with this agreement.

| Signature of Student | Co-Signature of Parent/Guardian if Student is Under 18 Years of Age | Date |
|---|---|---|
| | | |

### Introduction
The concept of on-campus housing at Howard Payne University embodies much more than an assignment in a residence hall. The residential community is an integral part of the University. Residence within this community implies certain obligations and standards of citizenship. Thus, a large measure of responsibility is delegated to residents in the areas of social life, extracurricular activities, conduct, and the protection of University property. Violation of University policies and regulations may result in disciplinary action and/or termination of this agreement. Students are advised to acquaint themselves with the *Student Handbook* and the *Howard Payne University Catalog* prior to moving into campus living facilities.

The University complies with all applicable federal and state nondiscrimination statutes and does not engage in prohibited discrimination on basis of race, creed, color, national or ethnic origin, sex, religion or handicap. In certain circumstances, Howard Payne University may exercise the authority to interpret, revise, extend, or grant exceptions to this agreement on the basis of need and merit of individual cases.

### Period of Agreement
The period of this agreement is for the entire academic year (Fall and Spring semesters) unless otherwise described in this agreement. Failure of the student to check into the assigned room by 5:00 p.m. on the first day of classes of each semester will result in the assignment of the room to another student. Failure to check in by the student will not release the student from any University policy requiring the student to reside on-campus, nor from other obligations set forth in this agreement. Proper check-in consists of contacting a staff member in the assigned residence hall during the check-in period and receiving a room key and check-in materials. Every effort will be made to hold the assignment if the Office of Student Life is notified of an anticipated delayed arrival, but specific room assignments are not guaranteed. All students must check out of the hall within 24 hours of their last final examination (or by the designated hall closing time), graduation, or termination under terms of this agreement. Residence halls are closed for holiday periods. The residence halls may not be occupied until the dates indicated on the current University calendar. An additional agreement between the student and the University will be required for summer housing.

In the event that the assigned accommodations are destroyed, or otherwise made unavailable by the Office of Student Life, and the University cannot furnish other accommodations, the agreement will terminate without penalty to either party and all rights and liabilities of the parties shall cease and payments previously made by the student shall be refunded on a prorated basis for the period in which accommodations were unavailable to the student. Howard Payne University reserves the right to terminate this agreement for any reason without any justification.

(APPLICATION/AGREEMENT CONTINUED ON REVERSE)

### RETURN COMPLETED APPLICATION/AGREEMENT TO:
Howard Payne University • Office of Student Life • 1000 Fisk Street • Brownwood, TX 76801
Phone: (325) 649-8017 • Fax: (325) 649-8905 • E-mail: slife@hputx.edu • Physical Location: Mabee University Center

| For Office Use Only | Received/Date | Housing Assignment Hall: J  T  V  Room_____ Phone_____ | Staff Initial | Notes: |
|---|---|---|---|---|
| | | | | |

By signing this *Application/Agreement*, the Dean of Students executes this agreement between the student (or with the student and parent/guardian if the student is under 18 years of age at time of signing) and the University.    Dean of Students Signature _____    Date _____

### Requirements for Housing

Any student moving into the residence halls must have completed this housing application/agreement and submitted it to the Office of Admission along with the $200 Enrollment Deposit, $100 of which will be held as a Housing Deposit against damages and fines. The University requires full-time, unmarried students between the ages of 17 and 22 who are not living with parents to live in a University residence hall for four (4) full semesters (i.e., fall and spring semesters) until 60 verifiable credit hours are completed or the student reaches 22 years of age. Students under the age of 17 are restricted from living in University housing. Students living in University residence halls are required to purchase a residential meal plan (12, 15, or Unlimited plan). Students desiring to change their meal plan election for a given semester must do so on or before the last date to register or change classes, which is published in the University calendar. A residential meal plan must be maintained for the entire agreement period (meal plans are subject to change). Students who live within commuting distance, and are therefore exempted from on-campus housing for the period of this agreement, must reside with the parent legal guardian. Requests for release from any part of this agreement must be made in writing to the Office of Student Life, using the *Application for Permission to Live Off Campus* form available from that office. The decision to release a student from a housing agreement is at the University's sole discretion.

This agreement may not be transferred or assigned to another person. The Office of Student Life makes all residence hall and room assignments and may also make any subsequent changes advisable or necessary. Residents are not permitted to "sublease" the room nor permit any other person to occupy it for any period of time.

### Cancellation or Termination of this Agreement

Requests to cancel the residence hall reservation must be made in person or in writing to the Office of Student Life by June 1 for the Fall semester or January 1 for the Spring semester to avoid forfeiture of the housing deposit; after these dates and prior to move-in, Housing Deposits are not refundable. Notifications submitted to offices other than the Office of Student Life DO NOT comply with this requirement and will not be honored. The University reserves the right to cancel or change any assignment at any time.

If a student is withdrawn, suspended, dismissed, expelled, or otherwise removed from the halls for conduct reasons, the University may terminate the agreement and upon termination the student shall vacate the room within 24 hours or sooner if so directed by the Office of Student Life.

### Deposit Forfeiture

Forfeiture and/or assessment of charges toward Housing Deposits will occur for the following reasons: (1) cancellation of housing application/agreement prior to move-in date but after June 1 for Fall semester housing or January 1 for Spring semester housing; (2) room left damaged or unclean at the time of move-out; (3) failure to return keys and/or to check-out with a residence staff member; and (4) failure to timely request in writing the refund of Housing Deposit within one year of vacating university housing. Students must clear all financial obligations to the university and submit a proper refund request form (see Office of Student Life) prior to the university issuing any Housing Deposit refunds.

### Refunds

According to the *Howard Payne University Catalog*, no refund of room rent is made if occupants vacate their rooms before the end of the contract period. Prepaid board is credited to the student's account less a charge for excessive Jacket Buck usage, if any, effective with the date students turn in their meal card (I.D.) to the cashier and request a refund in writing less a service deduction of $50.

### Overassignment of Rooms and Consolidations

At the beginning of each semester, residence hall occupancy may be expanded through the assignment of students to study rooms, recreational rooms, and "triples" of what are normally double rooms. These overassignment spaces are used until regular double occupancy room accommodations become available; The University may also assign the additional space in a double room to another student, as that space becomes available. Furthermore, students in double rooms who are without a roommate may be required to move to vacancies to consolidate room usage.

### Room Changes

Room changes may be made during the period of time designated by the Office of Student Life. Any room change made during this designated period may be subject to a $25 charge. If the Office of Student Life initiates a room change, no charge will be assessed to the student. Room changes made without authorization from the Office of Student Life will result in fines and/or disciplinary action. The Office of Student Life reserves the right to reject any room change request for any reason.

### Private Rooms

Residents who request to privately occupy a room at less than capacity (and space is available) may be granted approval by the Resident Director and Business Office and then pay additional rent of $400.00 per semester. Private rooms are not generally permitted for first-year students in their first semester of college (since graduating from high school). After the designated time period for room changes, the private room charge is nonrefundable and will not be prorated.

### Room Entry

The University may enter a student's room to inspect property, seek and/or confiscate unauthorized property, make repairs, respond to an emergency, ensure evacuation during a fire/tornado alarm, or for any other purposes including suspected violations of University policies at any time.

### Responsibilities for the Room

The University agrees to provide a room and make a reasonable effort in conjunction with the student to create a worthwhile, educationally relevant living experience. Except in cases of student negligence, the University agrees to make necessary room repairs in a reasonable time. Modifications to the room are not permissible without the permission of the Dean of Student Life.

The student will be held accountable for the condition of the room and all furnishings assigned to that room, and shall reimburse the University for all damages to or loss of these furnishings and accommodations. Students are responsible for maintaining the cleanliness of their rooms and residence hall public areas. Failure to do so may result in disciplinary action and/or cleaning charges. Additionally, students may be held accountable for any abnormal wear, damages, or cleaning in public areas of their hall to include billing of damages to individual students when such wear, damages, or cleaning can be attributed to a specific floor, section, or wing therein. The University shall make determination of the amount of such loss or damage. Residents are expected to keep rooms reasonably clean at all times.

### Summer Housing

Application/Agreements for summer housing become available in the Spring semester and are applicable only for housing provided during the summer terms. Applying for summer sessions is not considered an application for the Fall and Spring semesters. Summer Housing is subject to availability limitations.

### Insurance Requirements

Howard Payne University does not provide accident or health insurance. Each student must secure his/her own medical insurance.

### Security/Damages

Precautions are taken to maintain adequate security in the residence halls; however, the University is not responsible for loss or damage to personal property or personal injury/safety in University housing by fire, water, theft, vandalism, or other causes (including death, rape, and assault). Students and parents are strongly encouraged to purchase renter's insurance, or check on the transferability of coverage from their home owner's insurance, to cover the student's personal belongings and safety. Students are strongly encouraged to take appropriate precautions for the student's own safety, including but not limited to, closing and locking doors, escorting guests, and being escorted while on campus.

### Policies, Regulations, and Safety

Each student is responsible for abiding by all policies and regulations of Howard Payne University as set forth in the *Student Handbook* and the *University Catalog*. Each student must abide by all policies and regulations, printed or electronic, including those stated herein, as these are incorporated into this agreement. Failure to do so may result in disciplinary action. In the event of a conflict in published polices, the latest revision shall govern. Note: all buildings, including the residence halls, prohibit smoking and the use of all tobacco products.

### Other Provisions

The University may determine when provisions of this agreement are violated and determine the appropriate action. If any section of this agreement becomes invalid, it will not affect the validity or enforceability of the remaining provisions of this agreement. The University reserves the right to refuse any *University Housing Application/Agreement*. This agreement constitutes the entire housing agreement between the student and the University. No oral agreements have been made. No amendment to this agreement is valid unless in writing and signed by the Dean of Students.

### Bacterial Meningitis Immunization

According to Texas law, on and after January 1, 2012, all first-time students, including transfer students, must present a certificate to the institution demonstrating they have been vaccinated against bacterial meningitis. A student may be exempt from the requirement if he or she presents a physician's certificate indicating the vaccination would injure the health of the student or if he or she signs an affidavit declining the vaccination due to reasons of conscience including religious belief. The latter provision does not apply during a public health emergency, terrorist attack, hostile military or paramilitary action or extraordinary law enforcement emergency. The bill exempts a student who is enrolled only in online or other distance education courses or who is 30 years of age or older. New and former HPU students to whom this requirement applies will not be permitted to schedule classes until compliance with this law is demonstrated by submitting the necessary paperwork (i.e., shot record, state affidavit, or physician's certificate). The vaccination or a booster must have been received within five years of the student's first day of classes.

**APPENDIX B**



In The

# Eleventh Court of Appeals

No. 11-13-00277-CR

## THE STATE OF TEXAS, Appellant

## V.

## MIKENZIE RENEE RODRIGUEZ, Appellee

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR22-398**

## OPINION

Mikenzie Renee Rodriguez was indicted for possession of a controlled substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115 (West 2010). She filed a pretrial motion to suppress in which she challenged the search of her college dorm room and any statements she made in connection with her arrest. The trial court granted her motion, and the State appealed. We affirm.

*Background Facts*

Appellee was a student at Howard Payne University, a private university in Brownwood. Appellee lived on campus in Veda Hodge Hall. In September 2012, Miriam Mackey and Catherine Mullaney, the resident assistants on duty, conducted a room check of Appellee's dorm room. They conducted this room search pursuant to their duties as resident assistants in accordance with the policies and procedures of Howard Payne University for students living in on-campus housing. The room check was not performed at the request of any law enforcement agency.

Mackey and Mullaney found a baggie of marihuana in a trunk located in Appellee's room. Mackey and Mullaney contacted Nancy Pryor, the resident director at Howard Payne University, to report this discovery. Pryor instructed Mackey and Mullaney to thoroughly search the room. They subsequently found two pills inside a box of matches and a marihuana pipe wrapped in a sock. They placed the items in the middle of the floor of the dorm room. Pryor then called Howard Payne University's Department of Public Safety.

Officer Robert Pacatte, with the Howard Payne University Department of Public Safety, responded to the call. Pryor initially met Officer Pacatte at the entrance to the dorm. He subsequently accompanied Pryor to Appellee's dorm room. Officer Pacatte stepped inside the dorm room and saw the items on the floor. He did so without obtaining a search warrant or consent from either Appellee or her roommate. Officer Pacatte took pictures of the items and spoke with Adrienne Sanchez, Appellee's roommate. Sanchez informed him that the items belonged to Appellee.

Officer Pacatte then contacted the Brownwood Police Department. The Brownwood Police Department and the Howard Payne University Department of Public Safety had an interlocal agreement concerning crimes committed on campus. Corporal Aaron Taylor of the Brownwood Police Department responded to the dorm

2

room. Appellee arrived at her dorm room later. She was given her *Miranda*[1] warnings, and she admitted that the items were hers.

Appellee filed a motion to suppress the evidence seized and any statements made before, during, or after the search. The trial court held a hearing on the motion and, after initially taking the matter under advisement, granted Appellee's motion to suppress. The trial court subsequently entered written findings of fact and conclusions of law.

*Analysis*

The State asserts four issues challenging the trial court's ruling on the motion to suppress. We note at the outset that the State has limited rights of appeal in criminal cases. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01 (West Supp. 2014). The State is entitled to appeal an order of a court in a criminal case that grants a motion to suppress evidence if jeopardy has not attached and if the elected prosecutor certifies to the trial court that the appeal is not taken for the purpose of delay and that the suppressed evidence is of substantial importance to the case. *Id.* art. 44.01(a)(5). The elected district attorney for Brown County personally signed the notice of appeal filed in this case certifying the matters required to invoke this court's jurisdiction to review the trial court's interlocutory order granting the motion to suppress. *See State v. Redus*, 445 S.W.3d 151, 154–55 (Tex. Crim. App. 2014).

A trial court's ruling on a suppression motion is reviewed on appeal for an abuse of discretion, with almost complete deference given to its determination of historical facts, especially if those facts are based on an assessment of credibility and demeanor. *See Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013) (citing *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). The same deference is afforded the trial court with respect to its rulings on application of the

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

3

law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of credibility. *Id.* For mixed questions of law and fact that do not fall within that category, a reviewing court may conduct a de novo review. *Id.* We review de novo a trial court's application of the law to the facts. *Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). Regardless of whether the trial court granted or denied the motion, appellate courts view the evidence in the light most favorable to the ruling. *Wade*, 422 S.W.3d at 666; *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011). If the trial court makes express findings of fact, as the court did in this case, we review the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports these factual findings. *Valtierra*, 310 S.W.3d at 447.

In its first issue, the State argues that the trial court erred by granting Appellee's motion to suppress "when Appellee does not allege any wrongdoing on the part of university officials who located and seized the evidence, because the actions of law enforcement did not implicate the Fourth Amendment." The State contends that Officer Pacatte's "action of stepping across the threshold of Appellee's dorm room and viewing the contraband laying exposed to view on the floor" did not implicate the Fourth Amendment. The State argues that, "[o]nce university officials located a controlled substance in Appellee's room," Appellee no longer had "a subjective expectation of privacy that law enforcement would not be called to her dorm room" that society would recognize as reasonable. The State suggests that we should apply the analysis from *State v. Hardy* to conclude that Appellee could not have had a reasonable, subjective expectation of privacy that law enforcement would not be called in these circumstances. *State v. Hardy*, 963 S.W.2d 516, 523–24 (Tex. Crim. App. 1997). The State also challenges the trial court's express finding that

4

the Howard Payne University Department of Public Safety and the Brownwood Police Department conducted a search.

We note at the outset that the State did not argue this theory at the suppression hearing. Instead, the State argued that there was no state action because the resident assistants were the actors that conducted the search. The State also argued that the incriminating evidence was in plain view of Officer Pacatte upon his arrival at Appellee's dorm room. Nevertheless, the trial court entered written findings of fact and conclusions of law that implicitly overruled the theory now advanced by the State. These findings of fact and conclusions of law are as follows:

**Findings of Fact**

. . . .

23. Howard Payne University Department of Public Safety and the City of Brownwood Police Department entered the residence of Adrienne Sanchez and [Appellee] when neither occupant was present and conducted a search that included – taking photographs of the room, investigating, and looking around the room. The officers who conducted the search seized items believed to be a controlled substance, paraphernalia, and marijuana.

24. Neither Howard Payne University Department of Public Safety nor the City of Brownwood Police Department obtained consent from Adrienne Sanchez or [Appellee] to conduct a search for the purposes of a criminal investigation or prosecution.

. . . .

**Conclusions of Law**

1. [Appellee] and her roommate consented to search by the University officials in the furtherance of health and safety concerns by signing the University Housing Agreement, but did not waive their rights under the Fourth Amendment of the United States Constitution and the applicable provisions of the Texas Constitution to protection from unreasonable searches and seizures.

. . . .

5

4. Officer Pacatte, as a licensed peace officer, was an officer of the State and his action is therefore subject to the limitations of the Fourth Amendment.

. . . .

6. Officer Pacatte did not have consent from [Appellee] or her roommate to search the dorm room.

. . . .

13. Without a search warrant, consent, exigent circumstances, or the plain view doctrine, Officer Pacatte's actions constituted an unreasonable search and seizure and therefore the evidence seized as a result of that search should be suppressed.

14. The issue before the Court in the hearing on the Motion to Suppress was the action of the two certified Texas police departments, Howard Payne University Department of Public Safety and the City of Brownwood Police Department, in conducting a search of a residence for the purposes of criminal prosecution in light of the protections granted to individuals under the Fourth Amendment of the *United States Constitution* and Article 1, Section 9 of the *Texas Constitution. U.S. Const. amend. IV; see also Tex. Const. art. I, § 9*; Tex. Crim. Proc. Code Ann. § 38.23(a) (West 2012).

. . . .

16. Consent to search could only have been given by [Appellee] or Ms. Sanchez under the court generated doctrine of common authority. A person with mutual use and joint access of the property is said to have such common authority. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *see also U.S. v. Matlock*, 415 U.S. 164, 171 (1974); *see also Morale v. Grigel*, 422 F. Supp. 988, 997 (D.N.H. 1976). While [Appellee's] roommate had common authority and could have consented to the search, she arrived after the initial entry of the officers and even upon arrival was not asked for consent.

17. The Court concludes that as a matter of law, two Texas police departments, Howard Payne University Department of Public Safety and the City of Brownwood Police Department, conducted a warrantless search of the residence of [Appellee] without the existence

6

of any exigent circumstance, including plain view, and failed to obtain consent.

18. The University acting by and through its Residence Hall Director, Nancy Pryor, had no authority to consent to or join in the police search for evidence of a crime under the circumstances of this case.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment provides protection from "unreasonable" searches and seizures by state actors. *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010). A search conducted without a warrant is generally considered unreasonable. *Id.* Whether a search was reasonable under the Fourth Amendment is a mixed question of law and fact. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

For purposes of the Fourth Amendment, a "search" occurs when the government violates a subjective expectation of privacy that society considers objectively reasonable. *See Kyllo v. United States*, 533 U.S. 27, 33 (2001). However, the Fourth Amendment proscribes only governmental action, not action by a private individual who is not acting as an agent of the government or with the knowledge and participation of a government official. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Even a wrongful search or seizure by a private citizen does not deprive the government of the right to use evidence obtained from the wrongful search. *See Walter v. United States*, 447 U.S. 649, 656 (1980).

The State's argument is premised on two contentions: (1) that Appellee no longer possessed a subjective expectation of privacy that society is willing to recognize as reasonable after the resident assistants found the contraband in her dorm room and (2) that the officers' entry into her dorm room did not constitute a search. We disagree with both of these contentions.

7

We begin our analysis by addressing the "search" question. The entry into a residence by police officers is a search for purposes of the Fourth Amendment. *Valtierra*, 310 S.W.3d at 448. As noted by the Texas Court of Criminal Appeals in *Spring v. State*, 626 S.W.2d 37, 41 (Tex. Crim. App. [Panel Op.] 1981):

> (P)hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, and (i)n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Neither may that threshold be reasonably crossed without a warrant by police officers, nor may the locked door be opened by the landlord or his agent to permit them to do so, for to uphold such an entry, search and seizure without a warrant would reduce the (Fourth) Amendment to a nullity and leave (tenants') homes secure only in the discretion of (landlords).

(alterations in original) (citations omitted) (internal quotation marks omitted). Thus, the officers' entry into Appellee's dorm room constituted a search.

We must next answer the question of whether Appellee had a subjective expectation of privacy in her dorm room that society considers objectively reasonable. This is a question of law we review de novo. *Hardy*, 963 S.W.2d at 523; *Villarreal v. State*, 935 S.W.2d 134, 146 (Tex. Crim. App. 1996); *see Wade*, 422 S.W.3d at 667; *Valtierra*, 310 S.W.3d at 447. Courts have held that "a student who occupies a college dormitory room enjoys the protection of the Fourth Amendment." *Piazzola v. Watkins*, 442 F.2d 284, 289 (5th Cir. 1971); *see also People v. Superior Court*, 49 Cal. Rptr. 3d 831, 848–49 (Cal. Ct. App. 2006). The First Court of Appeals concluded that a student "had an expectation of privacy in his dorm room and is thus afforded Fourth Amendment protection." *Grubbs v. State*, 177 S.W.3d 313, 318 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). We agree and accordingly conclude that Appellee enjoyed the same Fourth Amendment protection from unreasonable searches and seizures in her dormitory room as would any other citizen in a private home. *See id.*; *see also People*, 49 Cal. Rptr. 3d at 849.

There is no dispute that the resident assistants and Pryor had authority to conduct the room check of Appellee's dorm room under the authority of the various provisions that Appellee agreed to in accepting to live in on-campus student housing. Furthermore, there is no dispute that these individuals were not state actors. In reliance upon *Hardy*, the State contends that the discovery of the contraband by the dorm personnel diminished Appellee's expectation of privacy concerning a subsequent search by law enforcement. The defendant in *Hardy* was involved in an automobile accident. *Hardy*, 963 S.W.2d at 517–18. Hospital personnel, that were not government agents, drew the defendant's blood and analyzed it to determine its alcohol content for medical purposes. *Id.* A state trooper subsequently obtained the test results with a grand jury subpoena. *Id.* The Court of Criminal Appeals concluded that the defendant did not have a reasonable expectation of privacy in the test results. *Id.* at 526–27. In reaching this holding, the court noted that the "person's interest in bodily integrity" was not an issue because the blood was obtained and tested by medical personnel solely for medical purposes. *Id.*

The analysis in *Hardy* is inapplicable to facts in this case. The physical intrusion in *Hardy* in the form of withdrawing the defendant's blood from his body was performed by nongovernment actors. *Id.* at 517–18. In this case, the officers' entry into Appellee's dorm room constituted an actual, physical intrusion by government agents. Additionally, the State's contention that the discovery of contraband by dorm personnel had the effect of reducing her subjective expectation of privacy is not logical because there is no evidence that Appellee was aware that dorm personnel had searched her room or that they had discovered contraband in her room.

The State also relies on *Medlock v. Trustees of Indiana University* to support its position that Appellee no longer had a reasonable expectation of privacy. *Medlock v. Trustees of Ind. Univ.*, No. 1:11-CV-00977-TWP-DKL, 2011 WL

9

4068453, at *5 (S.D. Ind. Sept. 13, 2011). *Medlock* is also distinguishable from this case. *Medlock* involved an administrative proceeding with Indiana University rather than a criminal prosecution. *Id.* at *1. Next, the officer in *Medlock* observed the marihuana in plain view *prior to entering* the dorm room. *Id.* at *6. More importantly, the officer in *Medlock* actually obtained a search warrant. *Id.* We do not find that the State's reliance on *Medlock* is persuasive in light of *Grubbs*. *See Grubbs*, 177 S.W.3d at 318.

*Grubbs* is a relatively recent Texas case dealing with the search of a college dorm room. *Id.* at 316. A resident assistant received a complaint concerning the odor of marihuana coming from the defendant's dorm room. *Id.* University police were contacted at the request of the resident assistant as he proceeded to the defendant's dorm room. *Id.* Police officers met the resident assistant in the hallway outside of the defendant's dorm room and confirmed that the odor was marihuana. *Id.* After the inhabitants did not answer the door, the resident assistant entered the dorm room with a master key. *Id.* The resident assistant spoke with the inhabitants after entering the room. *Id.* The inhabitants of the dorm room then came to the doorway whereupon they gave the officers consent to search the dorm room. *Id.*

The court of appeals recognized that "a student who occupies a college dormitory room enjoys the protection of the Fourth Amendment." *Id.* at 318 (quoting *Piazzola*, 442 F.2d at 289). Accordingly, the court held that the defendant had an expectation of privacy in his dorm room and was thus afforded Fourth Amendment protection. *Id.* The court further recognized that the university's policies and procedures provided the resident assistant with "ample authority" to enter the defendant's dorm room. *Id.* at 319. The court ultimately concluded that the campus police officers did not violate the defendant's constitutional rights when they entered his dorm room with his consent. *Id.* at 321.

10

Contrary to the State's assertion that Appellee no longer had an expectation of privacy in her dorm room after the discovery of the contraband by dorm personnel, the critical inquiry in this case is the authority of the dorm personnel to consent to the officers' entry into the dorm room. One exception to the warrant requirement applies when a person voluntarily consents to a search. *Hubert*, 312 S.W.3d at 560. A third party may consent to a search of another's property if the third party has actual authority over the thing to be searched. *Id.* We examine the totality of the circumstances to determine whether it is reasonable under the Fourth Amendment for an officer to rely on the consent of another person to justify a warrantless search. *Id.*

The First Court of Appeals briefly touched upon this question in *Grubbs* by referring to a line of cases in support of the position that a resident assistant may not consent to an entry by police into a dorm room. 177 S.W.3d at 321 n.2. It was unnecessary for the court in *Grubbs* to explore this concept because the resident assistant was not the person that gave the officers consent to enter the dorm room— the actual residents of the dorm room gave the officers consent to enter. Accordingly, this case differs from the facts in *Grubbs* because the dorm personnel were the individuals in this case who gave the officers consent to enter Appellee's dorm room. Despite the authority given to the dorm personnel to enter the dorm room themselves, they simply did not have authority to give police officers consent to enter Appellee's dorm room. *See Piazzola*, 442 F.2d at 289–90; *Commonwealth v. McCloskey*, 272 A.2d 271, 273 (Pa. Super. Ct. 1970). As stated by the Fifth Circuit in *Piazzola*:

> [A] student who occupies a college dormitory room enjoys the protection of the Fourth Amendment. True the University retains broad supervisory powers which permit it to adopt the regulation heretofore quoted, provided that regulation is reasonably construed and is limited in its application to further the University's function as an educational

11

institution. The regulation cannot be construed or applied so as to give consent to a search for evidence for the primary purpose of a criminal prosecution. Otherwise, the regulation itself would constitute an unconstitutional attempt to require a student to waive his protection from unreasonable searches and seizures as a condition to his occupancy of a college dormitory room. Clearly the University had no authority to consent to or join in a police search for evidence of crime.

442 F.2d at 289–90 (footnotes and citations omitted).

The trial court did not err in concluding that Appellee had a reasonable expectation of privacy in her dorm room and that the entry into her dorm room by the officers of the Howard Payne University Department of Public Safety and the Brownwood Police Department implicated her Fourth Amendment protections. Additionally, the record supports the trial court's findings of fact that the officers entered Appellee's dorm room without either her consent or the consent of her roommate. Accordingly, we overrule the State's first issue.

In its second issue, the State challenges the trial court's determination that the evidence was not admissible under the plain view doctrine. The State contends that Officer Pacatte had a right to be inside Appellee's dorm room under the actual authority or apparent authority of the dorm personnel after the contraband was located. The State contends that, once Officer Pacatte was lawfully inside the dorm room, he had the right to seize the contraband because it was in his plain view.

Seizing contraband in plain view does not run afoul of the Fourth Amendment because the seizure of property in plain view involves no invasion of privacy and is presumptively reasonable. *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000). The plain view doctrine requires (1) that the law enforcement officers have a right to be where they were and (2) that it is immediately apparent that the items seized constitute evidence. *Id.* There is no disagreement that the items were immediately incriminating upon observation. Officer Pacatte testified, and the trial court found, that the items were evidence of a crime or contraband. The question is

12

whether Officer Pacatte was lawfully in Appellee's dorm room when he saw the items on the floor. In this regard, Officer Pacatte testified, and the trial court found, that he did not observe the contraband until he had entered Appellee's dorm room.

We have previously determined that dorm personnel did not have actual authority to permit the officers to enter Appellee's dorm room for the purpose of conducting a criminal investigation. Accordingly, the trial court found that the plain view doctrine is inapplicable from the perspective of actual authority because officers did not "have a right to be where they were" when they observed the contraband. With respect to the State's apparent authority contention, this argument was not made during the suppression hearing other than in the State's closing argument when the prosecutor stated, "And Ms. Pryor, as an official at the university, would have had apparent authority to invite the officer in. That is something that has not been at all addressed."

We review de novo the issue of whether a third party had apparent authority to consent to a search of another's property because this inquiry involves a mixed question of law and fact. *Hubert*, 312 S.W.3d at 559–60. A third party's actual authority over the property is not a prerequisite for a valid consensual search. *Id.* at 560. Our law also recognizes that, in some circumstances, a valid consensual search may occur when a third party has "apparent authority" over the property. *Id.* When an officer has a reasonable but erroneous belief that a third party has actual authority over the thing to be searched, apparent authority exists and the search may be reasonable. *Id.* at 561. "Apparent authority is judged under an objective standard: 'would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). It is the State's burden to show by a preponderance of the evidence that the person who consented to the search had

13

apparent authority to consent. *Hubert*, 312 S.W.3d at 561–62. Consequently, the State has the burden to show that the officer who conducted the search reasonably believed, based on facts known to him at the time, that the consenting party had authority over the property. *Id.*

The State provided no evidence of apparent authority. The State specifically argued that apparent authority was not addressed at all. The evidence established that Officer Pacatte simply accompanied Pryor into Appellee's dorm room without any inquiry concerning her authority to permit his entry into the dorm room. We conclude that the trial court did not abuse its discretion when it determined that Pryor did not have apparent authority to consent to the search of Appellee's room. We overrule the State's second issue.

In its third issue, the State argues that the trial court erred when it applied the exclusionary rule and suppressed the contraband and Appellee's statements to Corporal Taylor. The State contends that Appellee must prove that suppression of the evidence would create deterrence in the future and that the deterrent value is high. The State maintains that, "[i]n order for the deterrent value to be high, the police must exhibit deliberate, reckless or grossly negligent disregard for Fourth Amendment rights." *See Davis v. United States*, 131 S. Ct. 2419, 2427 (2011) (citing *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)).

The federal exclusionary rule is a deterrent sanction that bars the prosecution from introducing evidence obtained in violation of the Fourth Amendment. *Id.* at 2423. The Texas statutory exclusionary rule is broader than the federal exclusionary rule; the Texas rule applies to evidence that is obtained in violation of the federal and state constitutions, United States laws, and Texas laws. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005); *Wilson v. State*, 311 S.W.3d 452, 458 (Tex. Crim. App. 2010). Specifically, Article 38.23(a) of the Code of Criminal Procedure provides that "[n]o evidence obtained by an officer or other person in violation of

14

any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." CRIM. PROC. art. 38.23(a). The primary purpose of Article 38.23(a) is to deter unlawful actions that violate the rights of criminal suspects in the acquisition of evidence for prosecution. *Wilson*, 311 S.W.3d at 459.

The "fruit of the poisonous tree" doctrine serves to exclude from evidence both direct and indirect products of Fourth Amendment violations. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *State v. Iduarte*, 268 S.W.3d 544, 550 (Tex. Crim. App. 2008). However, evidence is not classified as a fruit that must be excluded merely because it would not have been discovered but for the violation. *Wong Sun*, 371 U.S. at 487–88; *Iduarte*, 268 S.W.3d at 550. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Wong Sun*, 371 U.S. at 488 (quoting JOHN MACARTHUR MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

The Court of Criminal Appeals recently addressed the exclusionary rule and the factors to consider in applying the rule. *State v. Jackson*, 464 S.W.3d 724, 731–33 (Tex. Crim. App. 2015). The court considered the temporal proximity between the illegal search or seizure and the items to be excluded, the presence of any intervening circumstances, and the "purpose and flagrancy of the official misconduct." *Id.* at 731 (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)). However, the court did not say the burden rests with the defendant to prove any of these factors. *See id.* The State has not cited, and we cannot find, any authority for the proposition that a defendant carries the burden of proving the deterrent value.

15

Appellee had the initial burden of producing evidence to rebut the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Appellee carried this burden once she established that the search and seizure occurred without a warrant. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). The burden then shifted to the State to prove the reasonableness of the search. *Id.* As discussed above, the State did not establish that the warrantless search was justified under the law. *Ford*, 158 S.W.3d at 492.

Appellee must also show that there was a causal connection between the police officer's violation of a law and the collection of evidence. *Pham v. State*, 175 S.W.3d 767, 772–74 (Tex. Crim. App. 2005). The burden then shifts back to the State to either disprove Appellee's evidence or raise an attenuation-of-taint argument to demonstrate that the causal chain was broken. *Id.* The State has not asserted that the attenuation doctrine should apply in this case, and we do not address it further.

Here, there was a causal connection between the officer entering Appellee's dorm room and the seizure of evidence. Officer Pacatte was called to Appellee's dorm room because some contraband had been found. Officer Pacatte testified that he had time to obtain a search warrant, but did not. Officer Pacatte simply entered Appellee's dorm room, seized the evidence, and then called the Brownwood Police Department. Appellee has shown there was a causal connection between the Fourth Amendment violation and the collection of evidence. *Pham*, 175 S.W.3d at 772–74; *see State v. Callaghan*, 222 S.W.3d 610, 615–16 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).

Next, we consider the factors discussed in *Jackson* to determine whether the trial court erred when it suppressed the contraband. *Jackson*, 464 S.W.3d at 731. The State has not argued any intervening or attenuation-of-taint factors. Thus, the absence of the intervening-circumstance factor dictates which of the remaining two *Brown* factors should carry greater significance. *Id.* at 731–32 (citing *State v.*

16

*Mazuca*, 375 S.W.3d 294, 306 (Tex. Crim. App. 2012)). "When police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights." *Id.* at 732 (quoting *Mazuca*, 375 S.W.3d at 306). When there is no intervening cause, the court considers the temporal proximity factor to be the most important. *Id.*

Emphasis on the temporal proximity factor favors the conclusion that the search of Appellee's dorm room, the seizure of the contraband, and Appellee's subsequent admission were indeed "obtained" by exploitation of the warrantless search. *Id.*; *Mazuca*, 375 S.W.3d at 306. Because the contraband was discovered by the police within a matter of seconds after Officer Pacatte entered Appellee's dorm room and because there was no intervening circumstance that provided justification for the search of Appellee's dorm room, we conclude that the taint of illegality had not been purged. The trial court did not err when it applied the exclusionary rule to the evidence seized. We overrule the State's third issue.

In its fourth issue, the State argues that the trial court erred when it suppressed Appellee's statements, and other evidence related to Appellee's arrest, as fruit of the poisonous tree. The State asserts that the basis for the suppression of the statements was the same as that for the suppression of the contraband and that, if the trial court erred when it suppressed the contraband, then the trial court also erred when it suppressed the statements. As discussed above, the trial court did not err when it suppressed the contraband seized. Therefore, the trial court did not err when it suppressed Appellee's statements. We overrule the State's fourth issue.

17

*This Court's* Ruling

We affirm the order of the trial court.

JOHN M. BAILEY

JUSTICE

September 24, 2015

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

18

**APPENDIX C**



**Registration for the Elected Conference in December is now open! Click here to register.**

(http://www.tdcaa.com/training/elected-prosecutor-conference)

*Two free online trainings:*
*Mandatory Brady Training*
*Ethics for Prosecutors Roundtable*

| Case of the Week | Announcements | News Twitter Feed | Upcoming Training |
|---|---|---|---|
|  |  |  |  |

### Case of the Week

<u>State v. Rodriguez</u>

<u>(11th COA)</u>

Police are not authorized to search a college dorm room without a warrant or consent, and representatives of the university do not have the authority to grant police access to a

### Announcements

- 2016 Annual Hotel Reservation Info
- McLennan County DA's chief investigator Mike McNamara dies
- Information regarding DNA mixture interpretation
- TDCAA Taking Nominations for Suzanne

### News Twitter Feed

- Jury in alleged kidnapping to continue deliberations today > http://t.co/8k1CLnREVV
- A Juror's Reaction After the Gabriel Hall Capital Murder Trial > #deathpenalty

### Upcoming Training

- Key Personnel and Victim Assistance Coordinator Seminar Galveston - Hotel Galvez
- Elected Prosecutor Conference San Antonio - La Cantera Resort
- 2016 Prosecutor

student's dorm.
Read.

---

## Support our Work



**TEXAS**
DISTRICT AND
COUNTY
ATTORNEYS
FOUNDATION

So the State is Always Ready.

McDaniel Award

- Edward Thomas, Policing Pioneer Who Wore a Burden Stoically, Dies at 95
- Houston Police legend Edward A. Thomas dies at age 95
- New TDCAA Code Books Available
- 2015 Victim Services Board Regional Elections
- Edward Bolton, CA investigator in Bell County, passes away
- New Confessions and Child Sexual Abuse Books Available
- Important memo for prosecutors from DPS
- Survey for National Center for Prosecution of Child Abuse

#capitalpunishmer
http://t.co/LhaPGt2pQE
- Fort Worth Lawyers to Seek Dallas DA Removal | http://t.co/m3t2WBNFQJ
- Walker County Releases Results of Narcotics Operation http://t.co/XeJJ6cxzOJ
- Judge sentences former prison guard for sexual assault of teenage girl http://t.co/UTsYFmKHi7
- Judge rules to shut down embattled apartment complex http://t.co/aYSfvRYaP8
- Guilty plea given in organized crime car-theft case > http://t.co/9TE3HuLqQ7
- Federal authorities raid rash of illegal Colorado pot grows >

Trial Skills Course (January)
Austin - Radisson Town Lake
- 2016 Investigator School San Antonio - Omni Colonnade
- Investigating and Prosecuting Sexual Assaults of Children San Antonio - Wyndham Riverwalk
- Civil Law Seminar Austin - Omni Southpark

#marijuana
http://t.co
/78B9NcBGUr

**APPENDIX D**



**National Institute
on Drug Abuse**
*The Science of Drug Abuse & Addiction*

Home » News & Events » News Releases » **NIDA highlights drug use trends among college-age and young adults in new online resource**

# NIDA highlights drug use trends among college-age and young adults in new online resource

Print

## Announcement

### May 18, 2015

Use of illicit drugs, including marijuana, has been rising steadily among college-aged young adults. In addition, non-medical use of stimulants, including Adderall and Ritalin, has more than doubled in the past few years. The National Institute on Drug Abuse (NIDA) has created a new section on its <u>website</u> featuring the most recent <u>Monitoring the Future</u> (MTF) national survey results on drug use among students enrolled full time in a 2- or 4-year college as well as young people of the same age group not attending college. It also includes links of interest to parents, educators, dorm supervisors, counselors, clinicians and researchers who work with this age group. Additional resources include infographics, statistics and trends, treatment guides, information about careers in addiction science as well as related videos, publications, articles, and other relevant materials.



For more information on NIDA's College-Age and Young Adults web page, go to: www.drugabuse.gov/related-topics/college-age-young-adults

For more information on the MTF Survey among College-Aged and Young Adults, go to: http://ns.umich.edu/new/releases/22362-college-students-use-of-marijuana-on-the-rise-some-drugs-declining and http://monitoringthefuture.org//pubs/monographs

/mtf-vol2_2013.pdf

---

**Contact:**
NIDA Press Office
301-443-6245
media@nida.nih.gov


**About the National Institute on Drug Abuse (NIDA):** The National Institute on Drug Abuse (NIDA) is a component of the National Institutes of Health, U.S. Department of Health and Human Services. NIDA supports most of the world's research on the health aspects of drug abuse and addiction. The Institute carries out a large variety of programs to inform policy and improve practice. Fact sheets on the health effects of drugs of abuse and information on NIDA research and other activities can be found at www.drugabuse.gov, which is now compatible with your smartphone, iPad or tablet. To order publications in English or Spanish, call NIDA's DrugPubs research dissemination center at 1-877-NIDA-NIH or 240-645-0228 (TDD) or email requests to drugpubs@nida.nih.gov. Online ordering is available at drugpubs.drugabuse.gov. NIDA's media guide can be found at www.drugabuse.gov/publications/media-guide/dear-journalist, and its easy-to-read website can be found at www.easyread.drugabuse.gov.


**About the National Institutes of Health (NIH):** NIH, the nation's medical research agency, includes 27 Institutes and Centers and is a component of the U.S. Department of Health and Human Services. NIH is the primary federal agency conducting and supporting basic, clinical, and translational medical research, and is investigating the causes, treatments, and cures for both common and rare diseases. For more information about NIH and its programs, visit www.nih.gov.


*NIH. . .Turning Discovery Into Health* ®


*This page was last updated May 2015*

---



**NIH...*Turning Discovery Into Health*®**